UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| **TERRY HARDEN** | ) |
| | ) |
| Plaintiff | ) |
| v. | ) |
| | ) |
| **PILLAR ENTERPRISE, LTD.,** | ) |
| | ) |
| and | ) |
| | ) |
| **BERLIN STEEL CONSTRUCTION COMPANY,** | ) |
| | ) |
| Defendants. | ) |

# EXHIBIT A
# TO
# NOTICE OF REMOVAL

VIRGINIA:

IN THE FREDERICK CIRCUIT COURT

| | |
|---|---|
| TERRY HARDEN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action No. CL10-683 |
| PILLAR ENTERPRISE, LTD., *et al.*, | ) ) ) |
| Defendants. | ) ) |

**SECOND AMENDED COMPLAINT FOR EQUITABLE AND MONETARY RELIEF AND DEMAND FOR A JURY TRIAL**

### Introduction

1. This civil action arises out of the wrongful termination of Plaintiff Terry Harden by Defendants Berlin Steel Construction Company and Pillar Enterprise, Ltd.

2. Defendants Berlin Steel Construction Company and Pillar Enterprise, Ltd. wrongfully terminated Harden in violation of the common law public policy exception to the at-will employment doctrine recognized by the Commonwealth of Virginia in *Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797 (1985). Additionally, and/or in the alternative, Defendants Berlin Steel Construction Company and Pillar Enterprise, Ltd. terminated Harden in retaliation for using leave pursuant to under the Family and Medical Leave Act of 1993, § 2 *et seq.*, 29 U.S.C.A. § 2601, *et seq.* ("FMLA").

### Jurisdiction and Venue

3. This Court has jurisdiction over the claims presented on the cause of action herein pursuant to Va. Code Ann. § 17.1-513.

1

4. Pursuant to Va. Code Ann. § 8.01-262, venue is proper in this Court because the causes of action herein asserted arose in Frederick County; because Defendant Pillar Enterprise, Ltd. has its principal place of business in Frederick County, and Defendants Pillar and Berlin Steel Construction regularly conduct substantial business activity in Frederick County.

### Parties

5. Plaintiff Harden is a resident of the State of West Virginia.

6. Defendant Berlin is a Connecticut corporation with its principal place of business and nerve center in Connecticut, and with a presence in several states including the Commonwealth of Virginia.

7. Defendant Pillar is a wholly owned subsidiary of Berlin and is a Delaware corporation located in Frederick County, Virginia with its principal place of business and nerve center in Virginia.

### Factual Allegations

8. Berlin furnishes and erects all types of steel buildings and structures as well as miscellaneous items such as stairs, handrails, grating, and ornamental iron.

9. Berlin advertises Pillar Enterprises, Ltd. as a Berlin location.

10. On or about October 10, 2005, Berlin, acting by and through Pillar, hired Harden as a fabricator/fitter with a wage of $18.00 per hour, which was eventually raised to $20.00 per hour.

11. Prior to his employment with Berlin and Pillar, Harden had approximately twenty-six years of experience in the welding/fabrication industry, beginning in the U.S. Navy shipyards in Norfolk, Virginia.

12. Although Pillar ostensibly hired Harden and Harden reported everyday to Randy

Glass at a Pillar jobsite, Harden was an employee of Berlin and Pillar.

13. Berlin's Human Resources Department oversaw Pillar employees and Pillar supervisors had no authority to terminate employees without Berlin's permission.

14. When Harden had questions regarding salary, benefits, or other employment questions he spoke with Berlin officials.

15. Correspondence and other documents, such as employee evaluations, were routinely printed and distributed on Berlin letterhead.

16. Berlin and Pillar were an integrated enterprise with interrelated operations, common management, centralized control of employment decisions, and common ownership and financial control, and they jointly employed Harden.

17. Throughout Harden's employment with Berlin he was under the supervision of Randy A. Glass, Pillar's Plant Manager.

18. Harden's fabrication team also consisted of Dan Thede, the Shop Foreman; Michael Risinger, the Quality Control/Weld Lead; William "Ed" Blye, Laborer; Terry Laird, Welder; Thomas Marshall, Fabricator; Brandon Thurston, Welder; Adam Johnson, Laborer; and Reuben Cruz, Fabricator.

19. Almost from the beginning of Harden's employment with Berlin it became evident that many of Harden's coworkers abused both prescription drugs and narcotics.

20. On numerous occasions Harden observed Marshall, Thurston, and Johnson selling oxycodone, a Schedule II Drug under the federal Controlled Substances Act, to Glass at the Pillar plant or in Pillar's parking lot.

21. Harden also observed Glass requesting Marshall or Thurston to arrange oxycodone purchases for him. On those occasions Marshall or Thurston would make phone

calls, and subsequently someone would come to the plant and meet with Marshall in the parking lot. Marshall would then meet with Glass in either the bathroom or in Glass' office to make an exchange.

22. Harden also observed money being exchanged between Glass and Thurston and Marshall, or occasionally Nichol Jenkins, a former Pillar employee. These drug sales were specifically witnessed by Harden on at least three occasions on or about October 14, 2009, on or about November 5, 2009, and on or about January 5, 2010.

23. Harden frequently observed Glass, Thurston, and Marshall leaving the bathroom with glassy and bloodshot eyes, impaired motor skills, and slurred speech. Harden witnessed Glass, Thurston, and Marshall evidence these manifestations on or about September 30, 2009, October 20, 2009, and October 27, 2009.

24. Berlin management witnessed Glass under the influence of drugs and did nothing to investigate further or discipline Glass. One such occasion was a visit to Pillar by Berlin's Vice President, James Bass, in or about November 2009.

25. Marshall and Thurston openly admitted to Harden on various occasions that they sold oxycodone to Glass. Marshall and Thurston told Harden how much they sold and how much they charged Glass and what the going rate for oxycodone was.

26. On or about January 20, 2010, Glass ordered the fabrication team to search the jobsite because he had lost a clear plastic baggie containing oxycodone pills. The oxycodone pills were not found and Glass instructed Marshall and Thurston to make calls to find replacements.

27. Glass later stated that he believed one of his suppliers took the oxycodone pills.

28. Beside oxycodone, street drugs such as cocaine and heroin were prevalent at the

Pillar jobsite.

29. Glass spoke openly about his drug use, even telling members of the fabrication team that he did work in a friend's fabrication shop in exchange for cocaine. Glass also told Harden that he would also take Ambien while drinking to heighten the effect.

30. The constant high under which Glass, Marshall, Thurston, and Johnson operated meant that their fabrication and welding work often took too long, was left incomplete, and was of shoddy quality.

31. Moreover, Glass was ignorant or ambivalent to the danger imposed on other employees by operating fabrication equipment under the influence of drugs.

32. On one occasion Thurston threatened to shoot Laird with a pistol Thurston kept at the Pillar jobsite. In response, Glass' only disciplinary action was to send Thurston home for the day.

33. On the day of the pistol incident both Thurston and Marshall were clearly under the influence of behavior modifying substances. Marshall was also sent home that day because he was too incapacitated to work. On Marshall's way home he blacked out in his car. When the police arrived, they found heroin and marijuana in Marshall's car. Marshall was subsequently arrested.

34. Glass perpetuated a culture at Pillar in which employees that either sold drugs or did drugs with Glass, specifically Marshall, Thurston, and Johnson, were favored over employees that did not.

35. Marshall, Thurston, and Johnson were often unable to perform their duties adequately because they were incapacitated. Nevertheless, Marshall, Thurston, and Johnson were not reprimanded by Glass for their shoddy work or the infrequent attendance.

36. Harden made numerous complaints about Glass' behavior to both Thede and Risinger. In response Thede and Risinger stated that they were aware of what was going on but they could do nothing about it.

37. When Glass found out that Harden had complained to Thede and Risinger, Glass was furious and told Harden that if he ever went to Berlin with his concerns Glass would terminate Harden "on the spot."

38. Following Glass' threat, Harden did not contact Human Resources or anyone at Berlin because he feared he would be fired.

39. In or about October 30, 2008, Harden almost broke his hand at the Pillar plant.

40. Harden went to Winchester Urgent Care in Winchester, Virginia, where a doctor prescribed Harden Lorcet Plus, which is the brand name for acetaminophen hydrocodone, for the pain.

41. When Harden returned to work, Glass asked Harden what his treating physician prescribed for his pain. Harden responded that he had been prescribed hydrocodone but that he did not intend to fill the prescription.

42. Glass responded that if Harden was not going to use the prescription, Harden should fill the hydrocodone prescription and give the medications to Glass. Glass also told Harden that the dose Harden had been prescribed would be like "taking M&Ms" to Glass.

43. Harden related this incident to both Risinger and Thede, who responded by laughing and saying they "weren't surprised" and "that's Glass for you."

44. Harden tore up the prescription and never filled it.

45. In response Glass began to harass Harden, telling him that he did not smile enough, and that he wanted Harden to change his personality. Glass went as far as telling

Harden that other members of the fabrication team did not want to work with Harden and that some people had left the company because they disliked Harden.

46. In November 2009, Harden was diagnosed with and treated for Stage II Lyme Disease. This condition left Harden weak and tired, but he still able to work.

47. Accordingly, Harden returned to work with physician mandated restrictions of not lifting more than ten pounds or performing repetitive motion with his left arm, due to the placement of an intravenous catheter ("IV") in Harden's left arm.

48. This was not a problem for Harden, however, as Berlin and Pillar had previously extended light duty to employees recovering from surgeries and other health conditions. In fact, earlier in 2009, Nicole Jenkins, a welder in Pillar's facility, underwent leg surgery, and Berlin and Pillar gave her office work and other light duty work to perform during her recovery period.

49. Glass indicated concern that Harden would not be able to perform his usual fabrication work at the Pillar shop with the IV in his arm, and he told Harden that he could not perform his usual job duties.

50. After Glass articulated his concerns to Harden, Karen Nemergut, Berlin's head of Human Resources, contacted Harden and told him that he was eligible to take leave classified as Family and Medical Leave under Berlin's FMLA policy. During this FMLA leave Harden would receive short term disability benefits that paid Harden at a rate of compensation substantially lower than if he performed light duty work at Berlin and Pillar in lieu of his normal fabrication duties.

51. Nemergut overnighted to Harden Berlin's FMLA application, and she informed Harden that if he wanted to use FMLA leave he needed to have a doctor certify the application for FMLA leave. Nemergut gave no reason why Harden should not rely on the offer of FMLA

leave.

52. Harden relied on Berlin's offer of FMLA, completed the application, and submitted it to Nemergut.

53. Harden took FMLA leave from on or about November 16, 2009, to on or about December 21, 2009, and made a full recovery.

54. Shortly after Harden utilized FMLA leave, Glass marked Harden as "Below Standards" for Attendance and Punctuality on Harden's 2009 Employee Performance Review.

55. On or about March 4, 2010, Glass called Harden into Glass' office.

56. Glass informed Harden that Harden was being laid off. Glass then told Harden that the layoff would only be for a three to four week period.

57. Also on March 4, 2010, Glass told Blye and Laird that they too were being laid off.

58. No member of the fabrication team that had either regularly supplied drugs to Glass or who regularly took drugs with Glass was laid off at that time, and Glass and other Berlin and Pillar employees involved in the selection of Harden as an employee to be laid off had relied on Harden's use of FMLA leave as a motivating factor in their decision to lay him off.

59. Glass and other Berlin and Pillar employees involved in the selection of Harden as an employee to be laid off believed that Harden's utilization of FMLA leave in or around November and December 2009 was inconvenient and counted it against Harden when deciding who should be laid off.

60. If Harden had known that the utilization of the Berlin's instruction to take FMLA leave would be used against him in future employment decisions he would not have submitted the FMLA application. Rather, Harden would have requested light duty while he recovered from

8

Lyme Disease, which would have been financially preferable as well because he would not have had a reduced weekly wage.

61. Moreover, if Harden had known that utilizing FMLA leave would or could be used against him, he would have requested light duty such as Berlin and Pillar afforded to Jenkins. Harden was willing and able to perform light duty, including office work, and it was within his work restrictions. Harden had even initially returned to Pillar after being diagnosed with Lyme Disease, willing and able to work under the doctor's restrictions, and he only agreed to use FMLA leave after Pillar and Berlin offered it to him.

62. When Berlin and Pillar determined what employees would be laid off in or around March 2010, Harden's utilization of FMLA leave in or around November and December 2009 was a motivating factor in deciding to terminate Harden. However, Glass and other Berlin and Pillar employees involved in the selection of Harden as an employee to be laid off did not tell Harden that Harden's utilization of FMLA leave in or around November and December 2009 was a motivating factor in their deciding to terminate Harden.

63. Harden's reliance on Nemergut's instruction to utilize FMLA leave resulted in a detriment to Harden in that it was a motivating factor used by Pillar and Berlin's decision-makers to determine that Harden should be laid off.

64. On or about March 8, 2010, Harden determined that his layoff was not temporary as Glass had stated, but was in fact permanent.

65. After Harden received severance and accrued annual leave checks, Harden immediately called Berlin Human Resources and spoke with Karen Nemergut.

66. Nemergut informed Harden that he had been laid off permanently due to the economy. Harden asked if he could file a grievance and Nemergut told him that this was not

possible because Harden had been laid off and not fired for cause.

67. Harden then disclosed to Nemergut that he believed Glass had retaliated against him for not supplying Glass with drugs and for not enabling the drug abuse at the Pillar jobsite.

68. Harden further told Nemergut that the other employees that had been laid off, Lair and Blye, also did not supply Glass with drugs but that the employees who did supply Glass with drugs - Marshall, Thurston, and Johnson - were not laid off even though they had less seniority than Blye, Laird, and Harden.

69. Nemergut's response to Harden's disclosure was that she was unaware of any drug use at Pillar and that the termination would stand.

70. Defendants terminated Harden because Harden was not a drug supplier to Glass and because Harden did not use drugs on a casual or regular basis with Glass at work. The employees who were not selected for layoffs were those employees that acted as drug suppliers and/or consumed drugs at work with Glass.

71. As a result of Defendants' illegal retaliation and/or wrongful termination, Harden has suffered from anxiety, general depression, and insomnia.

## COUNT I
### Wrongful Discharge in Violation of Public Policy
### Against All Defendants

72. Plaintiff incorporates and realleges the allegations in the preceding paragraphs as though fully set forth herein.

73. At all times mentioned in this complaint Va. Code Ann. § 18.2-248, which makes it "unlawful for any person to manufacture, sell, give, distribute, or possess with intent to manufacture, sell, give or distribute a controlled substance or an imitation controlled substance" was in full force and effect.

74. At all times mentioned in this complaint Va. Code Ann. § 18.2-250, which makes it "unlawful for any person knowingly or intentionally to possess a controlled substance unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of his professional practice, or except as otherwise authorized by the Drug Control Act, § 54.1-3400, *et seq.*, was in full force and effect.

75. At all times mentioned in this complaint Va. Code Ann. § 54.1-3448 lists Oxycodone and Hydrocodone as a Schedule II controlled substances.

76. Virginia public policy exception makes it unlawful for an employer to discharge an employee if that employee's termination contravenes public policy embodied in Virginia's statutes. *See Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797 (1985).

77. The Supreme Court of Virginia has recognized a cause of action for wrongful discharge under *Bowman* for an employee's refusal to engage in criminal conduct. *See Rowan v. Tractor Supply Co.*, 263 Va. 209, 214, 559 S.E.2d 709, 711 (Va. 2002).

78. Glass' solicitation of prescription pain killers from Harden would have required Harden to violate Va. Code Ann. § 18.2-248, which prohibits the selling, giving, or distributing of a controlled substance.

79. Defendants terminated Harden while contemporaneously retaining other employees who regularly supplied Glass with controlled substances and/or illegal drugs and/or regularly possessed and/or consumed controlled substance and/or illegal drugs with him. As such Defendants terminated Harden because he was not a drug supplier to Glass and because he did not possess and/or consume controlled substances and/or illegal drugs with Glass.

80. As the direct and proximate result of Defendants' illegal termination of Harden, Harden has sustained damages.

11

81. WHEREFORE, Harden demands all relief legally available to him from Defendants in an amount to be determined at trial, including, but not limited to compensatory damages, punitive damages, fees and costs, equitable relief, and any other relief this Court deems just and proper to award.

**COUNT II**
**FMLA Retaliation**
**Against All Defendants**

82. Plaintiff incorporates and realleges the allegations in the preceding paragraphs as though fully set forth herein.

83. At all relevant times herein, 29 U.S.C. § 2615 (a) was in full force and effect.

84. Berlin and Pillar willfully and intentionally selected Harden to be laid off in or around March 2010 because Harden utilized the FMLA leave offered by Berlin and Pillar.

85. Defendants Berlin and Pillar illegally retaliated against Harden when they terminated Harden because of Harden's use of FMLA, and Harden's FMLA leave was a motivating factor in the decision to layoff Harden.

86. Harden utilized FMLA leave only after relying on the fact that the leave would not be counted against him later because it was Berlin that instructed him to take the leave in the first place. Harden did not request light duty as Jenkins received because he relied, to his detriment, on Nemergut's instruction to utilize instead FMLA leave.

87. Defendants Berlin and Pillar's business reason for the selection of Harden for termination is pretext.

88. Defendants Berlin and Pillar, by and through its officers, agents, supervisors, and employees, was aware of Harden's protected conduct.

89. Defendants Berlin and Pillar wrongfully discharged Harden because he exercised

his right to take leave granted under FMLA. Defendants used Harden's FMLA leave usage as a motivating factor for terminating his employment, and in so doing retaliated against him for use of leave under FMLA. The facts alleged set forth a claim under 29 U.S.C. § 2617 for intentional violation of 29 U.S.C. § 2615(a) and (b) for interfering with, restraining, and/or denying Harden's exercise of his right to family leave, by discharging Harden for exercising his right to family leave and by discriminating against Harden for exercising his right to medical leave under the FMLA 29 U.S.C. § 2601, *et. seq*.

90. As a result of Defendants Berlin and Pillar's violations of the FMLA, Harden has suffered and will continue to suffer loss of wages and benefits, loss of employment opportunities and career advancement, and damage to his professional reputation.

91. Harden has no adequate or complete remedy at law to correct the unlawful employment practices set forth herein, and this suit for damages, injunctive and other equitable relief is his only means of securing adequate relief. Harden is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants Berlin and Pillar's discriminatory practices unless this Court grants relief as requested.

92. WHEREFORE Harden demands judgment against Defendants Berlin and Pillar and prays:

 a) That this Court order Defendants to pay Harden lost wages, benefits and other compensation, plus interest;

 b) That this Court award Harden nominal, liquidated and punitive damages as allowed by statute;

 c) That this Court grant Harden reasonable attorney's fees and any other costs of this action;

 d) That the costs of this action be taxed against Defendants Berlin and Pillar; and

e) That this Court award Harden such other and further relief as may be deemed just and equitable.

## JURY DEMAND

Plaintiff demands a jury for all issues proper to be so tried.

Respectfully submitted,
*By Counsel,*

R. Scott Oswald, Esq.
Virginia Bar No. 41770
Nicholas Woodfield, Esq.
Virginia Bar No. 48938
THE EMPLOYMENT LAW GROUP, PC
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
nwoodfield@employmentlawgroup.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Second Amended Complaint was served by e-mail and first-class mail on this 4th day of February, 2011, upon the following counsel:

Lynn F. Jacob, Esq.
Heath Galloway, Esq.
Williams Mullen
Williams Mullen Center
200 South 10th Street
Richmond, VA 23219

Nicholas Woodfield